**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LINDA JACKIE LARSON, Personal Representative of the Estate of Kenneth Earl Larson, *Plaintiff-Appellant*, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security, *Defendant-Appellee.* | No. 18-35985 <br><br> D.C. No. 4:17-cv-00110-JTJ <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Montana
John T. Johnston, Magistrate Judge, Presiding

Argued and Submitted November 7, 2019
Portland, Oregon

Filed July 21, 2020

Before: Ronald Lee Gilman,[*] Richard A. Paez,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Paez

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Social Security

The panel affirmed the Commissioner of Social Security's reduction of a claimant's social security retirement benefits pursuant to the Windfall Elimination Provision (WEP) of the Social Security Act.

When claimant retired from his position as a full-time dual-status military technician, he was eligible for three types of retirement benefits: a civil service retirement system pension, a military pension, and social security retirement benefits. Dual-status technicians are members of the armed forces who are assigned to work in civilian positions. The WEP provision applies to retirees, like the claimant, who are entitled to social security benefits and pension benefits from employment not covered by social security. Claimant argued that an exception to the WEP – the uniformed services exception – applied to him, and shielded his benefits from reduction under the WEP.

The panel held that the text of the uniformed services exception to WEP was ambiguous as applied to dual-status technicians. The panel further held that the Commissioner's interpretation of the uniformed services exception was reasonable, and was entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The panel, therefore, affirmed the Social Security Administration's WEP reduction of claimant's social security retirement benefits.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

William O. Bronson (argued), William O. Bronson PLLC, Great Falls, Montana, for Plaintiff-Appellant.

Sushma Soni (argued) and Alisa B. Klein, Appellate Staff; Kurt G. Alime, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

**OPINION**

PAEZ, Circuit Judge:

Kenneth E. Larson enlisted in the Montana Air National Guard in 1971. Just over a year later, he began working as a full-time dual-status military technician, a role that he held until his retirement in 2004. Dual-status technicians are federal civilian employees who are required to maintain membership in the Selected Reserve. *See* 10 U.S.C. § 10216(a). Larson also occasionally participated in inactive-duty training and was deployed overseas, for which he received separate military pay. *See* 37 U.S.C. §§ 204(a)(1), 206; 10 U.S.C. §§ 12731–41. Upon his retirement, Larson was eligible for three types of retirement benefits: a civil service retirement system (CSRS) pension, a military pension, and social-security retirement benefits.

At issue in this case is the manner in which the Social Security Administration (SSA) calculated Larson's social-security benefits. The SSA awarded Larson benefits, but reduced them pursuant to the Windfall Elimination Provision (WEP) of the Social Security Act, 42 U.S.C. §§ 401 et seq. That provision applies to retirees who, like

Larson, are entitled to social-security benefits *and* pension benefits from employment not covered by social security.

There are, however, exceptions to the WEP. Larson argues that one such exception—the uniformed-services exception—shields his benefits from reduction under the WEP. The exception applies to "a payment based wholly on service as a member of a uniformed service." 42 U.S.C. § 415(a)(7)(A)(ii)(III). Larson contends that he is entitled to the uniformed-services exception because he was required to serve in the National Guard (a uniformed service) for the duration of his employment as a dual-status technician.

Larson raised this argument with the SSA and requested reconsideration of the reduction. On reconsideration, the Commissioner rejected Larson's argument, and an administrative law judge affirmed. Larson then sought judicial review in the District Court for the District of Montana. The court agreed with the Commissioner that the uniformed-services exception did not apply and entered judgment for the Commissioner. Larson now appeals, again arguing that the SSA erred in applying the WEP to reduce his retirement benefits.

We conclude that the text of the uniformed-services exception is ambiguous as applied to dual-status technicians. But, because the Commissioner's interpretation of the uniformed-services exception is reasonable, it is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). We therefore affirm the SSA's reduction of Larson's social-security retirement benefits.

# I.

## A.

The Social Security Act provides retirement benefits for eligible individuals age 62 and older. 42 U.S.C. § 402(a). In its calculation of benefits, the SSA distinguishes between two types of employment: "covered" and "non-covered" employment. Covered employees pay social-security taxes and are entitled to social-security retirement benefits on their earnings; noncovered employees do not pay social-security taxes and are not entitled to social-security benefits. *See Das v. Dep't of Health & Human Servs.*, 17 F.3d 1250, 1253–55 (9th Cir. 1994); *see also* 42 U.S.C. § 410; 20 C.F.R. §§ 404.1003–38 (2016). Noncovered employees who work in the public sector may still participate in a pension plan like the CSRS and receive a pension upon retirement. *See Das*, 17 F.3d at 1253.

Social-security benefits are calculated on the basis of retirees' lifetime earnings. Retirees who earned lower average monthly incomes receive a higher percentage of their earnings than retirees who earned higher average monthly incomes. This progressive pay-out system is intended to balance benefit adequacy with equity for retirees.[1] Before 1983, retirees who had earnings from *both* covered and noncovered employment could receive unusually high windfall payments because they were eligible for both social-security retirement benefits and a pension from an employer who did not withhold social-security

---

[1] *See* Andrew G. Biggs, Mark Sarney, and Christopher R. Tamborini, A Progressivity Index for Social Security, Office of Ret. & Disability Pol'y, Soc. Sec. Admin. (2009), http://www.ssa.gov/policy/docs/issuepapers/ip2009-01.html (last visited July 10, 2020).

taxes. These retirees had their social-security retirement benefits calculated using the higher-percentage return intended for workers with lower lifetime covered employment, but also received a separate pension from their noncovered employment. The combined benefits often exceeded the social-security benefit paid to a retiree who had similar earnings under covered employment.

To eliminate this windfall, Congress passed the WEP, 42 U.S.C. § 415(a)(7). The WEP reduces the social-security benefits of individuals who earn a pension from noncovered employment *and* qualify for covered-employment retirement benefits. *See* Social Security Administration Publication No. 05-10045, Windfall Elimination Provision (2020).

There are, however, statutory exceptions to the WEP. One of these exceptions is the "uniformed-services exception." This provision excludes from the WEP

> a payment based wholly on service as a member of a uniformed service (as defined in section 410(m) of this title) which is based in whole or in part upon his or her earnings for service which did not constitute "employment" as defined in section 410 of this title for purposes of this subchapter[.]

42 U.S.C. § 415(a)(7)(A)(ii)(III). A "member of uniformed service" is defined in section 410(m) as

> [a]ny person appointed, enlisted, or inducted in a component of the Army, Navy, Air Force, Marine Corps, or Coast Guard (including a reserve component as defined in section 101(27) of title 38), or in one of those

services without specification of component[.]

Congress enacted the exception to the WEP in order to address an anomaly in military service pensions. Before its passage, most categories of military service were already classified as covered employment and did not implicate the WEP or were expressly exempt. *See* 42 U.S.C. §§ 415(a)(7)(B)(i), 410(l)(1)(A)–(B). Active military service was classified as covered employment under the Social Security Act in 1957, and inactive duty by reservists became covered in 1988. *See* H.R. Rep. No. 103-670, at 125 (1994) (Conf. Rep.), *as reprinted in* 1994 U.S.C.C.A.N. 1553. A pension based on either type of service, therefore, if performed before 1957, did not trigger the WEP. *Id.* The only military pension that triggered the WEP before the passage of the uniformed-services exception was a pension based on inactive duty completed between 1956 and 1988. *Id.* The passage of the exception conformed the treatment of individuals receiving inactive-duty pensions based on service between 1956 and 1988 with the treatment of all other military retirees.

\* \* \*

Kenneth E. Larson[2] ("Larson") worked as an enlisted member of the Montana Air National Guard for thirty-five years. He received military pay for his part-time inactive-duty National Guard drills and training, which took place on weekends and during annual field trainings, and for his full-time active deployments. Nineteen months after enlisting,

---

[2] Linda Jackie Larson, the personal representative of Larson's estate, was substituted for Larson in the present litigation because he passed away in July 2019.

Larson began working for the Montana National Air Guard as a full-time dual-status military technician.

Dual-status technicians are members of the armed forces who are assigned to work in civilian positions. *See* 10 U.S.C. § 10216(a). They may help organize, administer, instruct, or train members of the National Guard, or they help maintain and repair supplies or equipment issued to the reserve or other armed forces. *Id.* § 10216(a)(C). The job requires that they also satisfy various military-service requirements: they must participate in inactive-duty training, wear a uniform, comply with military standards of conduct, meet physical requirements, and must be available for active deployment. Importantly, dual-status technicians must maintain membership in the National Guard for the duration of their employment. *See* 32 U.S.C. § 709(b); 10 U.S.C. § 10216(a).

After Larson retired in 2004, he began receiving his federal CSRS pension. Larson was also eligible for social-security retirement benefits because he paid social-security taxes on the military pay he earned while he served on inactive-duty training, active duty, and on his non-governmental civilian employment. *See* 37 U.S.C. §§ 204(a)(1), 206; 10 U.S.C. §§ 12731–41. Upon his retirement, then, Larson was entitled to two separate pensions: (1) his CSRS pension, based on his thirty-two years of noncovered earnings as a dual-status technician, and (2) his military pension, based on his thirty-five years of military service in the Montana Air National Guard. His military retirement benefits are plainly exempt from the WEP, either because his military service qualifies as covered employment under the Social Security Act, or because those benefits were based on Larson's membership in a uniformed service.

Larson was also eligible for social-security retirement benefits, which he applied for in early 2015. The same month, SSA notified Larson that he would receive reduced benefits because his employment as a technician was subject to the WEP. The SSA explained that Larson's monthly benefits would be reduced because he was entitled to "both Social Security and a pension based on work that is not covered by Social Security." In other words, the pension that Larson received from his employment as a dual-status technician was not "based wholly on service as a member of a uniformed service" within the meaning of 42 U.S.C. § 415(a)(7)(A)(ii)(III).

Larson sought reconsideration of the benefits determination, but the SSA again concluded that the WEP reduction applied. He then requested a hearing before an ALJ, who affirmed the Commissioner's decision. The ALJ explained that the "SSA interprets the uniformed-services exception to the WEP to mean that only monthly payments based on military service are exempt," and so payments received by dual-status technicians are not exempt because they "are based on noncovered civilian public employment."

The ALJ's decision became the final decision of the Commissioner after the Appeals Council declined to review it. Larson then sought judicial review in the District Court for the District of Montana. The court agreed that Larson's social-security retirement benefits were subject to the WEP and entered judgment in favor of the Commissioner. *See Larson v. Berryhill*, No. CV 17-110-GF-JTJ (D. Mont. Sept. 26, 2018).

The single question presented on appeal is the same as the question presented to the district court: whether payments made to a dual-status technician under a CSRS pension qualify as "payments based wholly on service as a

member of a uniformed service" for purposes of the uniformed-services exception, thereby exempting Larson's social-security retirement benefits from the WEP.

## B.

Four of our sister circuits have considered and answered the question before us. The Eighth Circuit held in *Petersen v. Astrue*, 633 F.3d 633 (8th Cir. 2011), that the WEP reduction did not apply to benefits payments received by a dual-status technician occupying a hybrid civilian and National Guard role. *Id.* at 637–38. The court explained that the plain language of the uniformed-services exception suggests that it applies to all service performed as a member of a uniformed service. *Id.* at 637. Because service technicians are required to maintain membership in the National Guard, and the National Guard is a uniformed service, the court reasoned that a technician's civil-service pension is based on work completed "by" a member of the uniformed service. *Id.* at 637–38. The court concluded that it would not "read a 'military duty' requirement into the statute" where that requirement was not clear from the statute's plain language. *Id.* at 637.

Shortly after the Eighth Circuit's decision in *Petersen*, the SSA issued an "acquiescence ruling."[3] The ruling binds internal components of the SSA but does not have the force or effect of law. It summarizes *Petersen*'s holding and

---

[3] Acquiescence rulings "explain how [SSA] will apply a holding" by a United States Court of Appeals that the SSA "determine[s] conflicts with [its] interpretation of a provision of the Social Security Act . . . or regulations[.]" 77 Fed. Reg. 51,842, 51,842 (Aug. 27, 2012); *see also* 20 C.F.R. §§ 404.985(a)–(b), 416.1485.

briefly describes the SSA's disagreement with the Eighth Circuit's interpretation of the uniformed-services exception:

> We interpret the uniformed services exception to the WEP to mean that only monthly payments based on military service are exempt from the WEP. Under this interpretation, monthly payments that are based on noncovered civilian public employment, including that of National Guard technicians who work under the [civil service retirement system], are not exempt from the WEP.

77 Fed. Reg. at 51,843. The SSA further states that the legislative history of the WEP "explains that the purpose of the exception was to exempt military retired pay, based on noncovered [inactive duty training] military duty, from application of the WEP. The exception was not intended to exempt any pension based on civilian work from application of the WEP." *Id*. The ruling concludes that the *Petersen* rule is limited to claimants within the Eighth Circuit.

The SSA also included its interpretation of the uniformed-services exception in the "Program Operations Manual System,"[4] (POMS) which describes how to apply the *Petersen* rule and addresses various difficulties that might arise in its implementation (e.g., an eligible individual moving in or out of the circuit).

---

[4] *See* Social Security Administration, RS 00605.380 National Guard Civilian Pensions for Dual-status Technicians: Petersen Court Case, Program Operations Manual (2019).

The Eleventh Circuit, when confronted with the same issue in *Martin v. Social Security Administration Commissioner*, 903 F.3d 1154 (11th Cir. 2018) (per curiam), reached a different conclusion. Relying on the acquiescence ruling and the POMS, the court agreed with the SSA that the uniformed-services exception did not exempt dual-status technicians from the WEP. The court first concluded that the uniformed-services exception was ambiguous, because the word "service" could mean employment generally *or* employment specific to military membership. In addition, the use of "as" in the phrase "based wholly on service as a member of a uniformed service" appears to limit the WEP exception to "payments for work performed in one's capacity or role as a member of the uniformed services"; thus, "the work for which Martin now receives civil service disability retirement payments—his employment as a dual status technician—must have been performed *in his role* as a member of the uniformed service." *Id.* at 1164. Because "Martin did not perform his dual status technician employment wholly as a member of a uniformed service . . . [CSRS] payments based on that employment do not qualify for the exception." *Id.* at 1168.

The Sixth Circuit agreed with the outcome reached by the Eleventh Circuit, but on different grounds. *See Babcock v. Soc. Sec. Comm'r*, 959 F.3d 210 (6th Cir. 2020). The court explained that the uniformed-services exception, "by its plain text," is "cabined to payments that are based exclusively on employment in the capacity or role of a uniformed-services member." *Id.* at 216. Because dual-status technicians receive payments not "based exclusively on employment" performed in a military capacity, the court held that the exception did not apply. *Id.* at 217. The Tenth Circuit agreed with the reasoning and outcome reached by

the Sixth. *See Kientz v. Comm'r*, *SSA*, 954 F.3d 1277, 1285–86 (10th Cir. 2020).

\* \* \*

In concluding that Larson's CSRS pension payments were subject to the WEP, the district court relied heavily on the Eleventh Circuit's decision in *Martin*. It held that the text of the exception was ambiguous, the legislative history was "not helpful," and the SSA's guidance on the issue was entitled to *Skidmore* deference.

## II.

## A.

We have jurisdiction over Larson's appeal from the district court's final judgment under 28 U.S.C. § 1291, and review de novo the district court's judgment upholding the Commissioner's denial of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1174 (9th Cir.2000). We "must affirm the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001).

## B.

The SSA urges us to conclude that the uniformed-services exception unambiguously exempts only payments based on employment that is entirely military in nature. This would exclude hybrid civilian-military employment such as Larson's position with the Montana National Guard.

Before deferring to agency interpretation, we independently examine the text and context of the statute. If

the statute—here, the uniformed-services exception—is unambiguous, we do not defer to the agency's interpretation. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). Where Congress has "directly spoken to the precise question at issue," and Congress's intent is clear, "that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron, U.S.A., Inc v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).

Our analysis differs, however, if we deem the statutory provision at issue to be ambiguous. But before concluding that the statute is ambiguous, we "exhaust all the 'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). We evaluate the plain text of the statute, its object and policy, the law's surrounding provisions, and the legislative history of its enactment. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001); *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). Only if genuine ambiguity remains after we have exhausted all possible interpretative tools at our disposal do we proceed to the agency's interpretation.

The uniformed-services exception to the WEP exempts from reduction "a payment based wholly on service as a member of a uniformed service[.]" 42 U.S.C. § 415(a)(7)(A)(ii)(III). The government's reading of the statute is plausible. It argues that "payment based wholly on service *as*" a military member means "payments for work performed *in one's capacity or role* as a member of the uniformed services." Although dual-status technicians occupy quasi-military roles, they do not perform their daily work entirely in a military capacity. If Congress had intended civilian technicians to receive retirement payments that were exempt from the WEP, the government explains,

it could have exempted payments "based on service *by* a member of a uniformed service[.]"

But the exception, as Larson notes, does not contain an explicit military-service requirement. It requires only that the employment be conducted as a *member* of a uniformed service. Dual-status technicians are required to maintain membership in a uniformed service as a condition of their employment, so every task that they conduct in their capacity as technicians is technically completed as a member of a uniformed service.

The addition of the word "wholly," however, supports the SSA's interpretation. "*Wholly* on service" suggests that exempted payments must be based on work performed wholly in one's military capacity. If Congress intended the statute to apply to work performed by employees required to hold membership in uniformed-services positions, it could have exempted payments "based on service" or "based on any service" performed "as a member of a uniformed service." Under Larson's reading, "wholly" is surplusage. *See, e.g.*, *Chicksaw Nation v. United States*, 534 U.S. 84 (2001) ("[E]very clause and word of a statute should if possible, be given effect.") (internal quotation marks omitted).

Larson argues that even if the exception requires that work be performed in a military capacity, the technician role is sufficiently military in nature to qualify. In addition to holding membership in the National Guard, Larson was required to participate in inactive-duty training, wear a military uniform while he worked, comply with military standards of conduct, meet military physical-fitness standards, and remain available for active military deployment.

He cites various cases describing how we and other federal courts have treated the dual-status technician role in other contexts. We have, for example, analyzed the dual-status technician role in considering whether a technician could overcome the doctrine of intra-military immunity and bring a Title VII suit. *See Zuress v. Donley*, 606 F.3d 1249, 1254 (9th Cir. 2010). We explained that "dual-status technicians have long been recognized as 'civilian employees whose positions require that they also serve in the military reserves.'" *Id.* (quoting *Williams v. Wynne*, 533 F.3d 360, 367 (5th Cir.2008)). But absent "a clear statement . . . from Congress to override our settled judicial doctrine of intra-military immunity," we held that the roles occupied by dual-status technicians were sufficiently military to bar them from suing under Title VII. *Id.* at 1255.

Many courts have described the dual-status technician role as "irreducibly military in nature." *See Leistiko v. Stone*, 134 F.3d 817, 820–21 (6th Cir. 1998); *see also, e.g.*, *Stauber v. Cline*, 837 F.2d 395, 399 (9th Cir. 1988) ("Although the technicians had dual status for some purposes, . . . military regulations, standard operating procedures, and active-duty military officers controlled how the shop was run."); *Wright v. Park*, 5 F.3d 586, 588–89 (1st Cir. 1993) ("We, too, conclude that, since National Guard technicians' positions are encompassed within a military organization and require the performance of work directly related to national defense, such positions are themselves military in nature."); *Illinois Nat. Guard v. Fed. Labor Relations Auth.*, 854 F.2d 1396, 1398 (D.C. Cir. 1988) ("While many of their duties are similar to those of employees who work in a typical civilian setting, technicians traditionally have been required to be members of their state National Guard units, and must perform even their civilian tasks in a distinctly military context, implicating significant military concerns.")

(internal quotation marks omitted). Other courts, however, have expressed doubt. *See, e.g.*, *Klotzbach v. Callaway*, 473 F. Supp. 1337, 1342–43 (W.D.N.Y. 1979) ("[T]he uniform requirement will not destroy the civilian characteristics of technicians' positions because they will remain entitled to federal civil service benefits.").

The dual-status technician statute defines the role as civilian. They are "Federal civilian employee[s]" who "shall be authorized and accounted for as a separate category of civilian employees." 10 U.S.C. § 10216(a), (b). Dual-status technicians were initially authorized in 1916, when Congress reconstituted state militias into the National Guard and provided funds for the Guard to employ state civilian employees "for the care of the material, animals, and equipment thereof." National Defense Act of 1916, § 90, 39 Stat. 166, 197, 199, 205; *see also* Act of June 19, 1935, 49 Stat. 391. By 1968, these state civilian employees served in a variety of different roles in each state's National Guard and continued to receive state benefits. The National Guard Technicians Act of 1968, Pub. L. No. 90-486, 82 Stat. 755 (codified at 32 U.S.C. § 709), converted these employees into federal employees for purposes of their retirement and other fringe benefits, but retained state authority over their supervision. H.R. Rep. No. 90-1823, at 1 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 3318, 3319. It appears that these roles were envisioned and classified as remaining "outside the competitive service," 32 U.S.C. 709(e), even though they support the National Guard.

The legislative history does not helpfully inform our reading. It is mostly silent with respect to the pensions of dual-status technicians. Prior to the adoption of the uniformed-services exception, the WEP's modified formula did not apply to military pensions based on (1) any type of

active military service; or (2) inactive duty by reservists (such as weekend drills) that occurred before 1957 or after 1987. Congress viewed this differential treatment of pensions based on inactive duty as "arbitrary and inequitable." H.R. Rep. No. 103-506 at 67, 1994 U.S.C.C.A.N. 1520. The uniformed-services exception was enacted to conform the treatment of inactive-duty military retirees between 1956 and 1987 with that of other retirees.

The legislative history could suggest that Congress intended to bring the pensions of work performed by *all* military service members (including dual-status technicians) into harmony, without regard to the type of duty served. But because Congress failed to explicitly address dual-status technicians' civil-service pensions, it may also have manifested a desire not to do so. The SSA adopts the latter position: the history, in its view, "explains that the purpose of the exception was to exempt military retired pay, based on noncovered military duty [inactive duty training], from application of the WEP. The exception was not intended to exempt any pension based on civilian work from application of the WEP." 77 Fed. Reg. at 51,843.

Both parties argue that the statute unambiguously supports their interpretation, and both parties present a plausible interpretation of the statute. The context of the dual-technician role, the WEP, and the legislative history of the uniformed-services exception do not resolve the genuine ambiguity in the text. We therefore conclude that the exception is ambiguous.

## C.

We fully defer to an agency's interpretation of a statute under *Chevron, U.S.A., Inc v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), where Congress has "delegated

authority to the agency generally to make rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). When *"*full-blown *Chevron* deference is not due"—either because Congress has not delegated rulemaking authority to the agency or the rule in question does not carry the force of law—courts still owe some deference to reasonable agency construction of statutes under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1237 (9th Cir. 2005). Agencies often make interpretive choices in applying statutes; those choices are due deference when they are "well-reasoned views" that reflect "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Mead*, 533 U.S. at 227 (quoting *Skidmore*, 323 at 139–40). The measure of deference owed to an agency interpreting its own governing statute in the face of ambiguity can range from very little to fully deferential, depending on the degree of the agency's care, consistency, formality, relative expertise, and the persuasiveness of the agency's decision. *Id*. at 228.

*Chevron* and later cases suggest that actions taken after rigorous vetting procedures and practices carry the force of law, and actions taken without such formality do not. *See Chevron*, 467 U.S. at 842–44; *Mead*, 533 U.S. at 230 ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). For this reason, policy statements, agency manuals, and enforcement guidelines do not carry the force of law and are not entitled to *Chevron*

deference. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

Congress delegated to the SSA the authority to make rules carrying the force of law. Under 42 U.S.C. § 405(a), the Social Security Commissioner is granted "full power and authority to make rules and regulations and to establish procedures, not inconsistent with provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations[.]" *See also* 42 U.S.C. § 1383 (allowing the Commissioner to define various statutory terms by regulation); 42 U.S.C. § 902(a)(5) (granting the Commissioner the authority to "carry out the functions of the Administration" by rulemaking).

But neither the SSA's acquiescence ruling nor the SSA's POMS manual[5] carry the "force of law"; these agency materials are issued without undergoing a process analogous to legislative vetting, *see Christensen*, 529 U.S. at 587, and they do not approximate formal rulemaking. *See Sierra Club v. Trump*, 929 F.3d 670, 692 (9th Cir. 2019); *see also Warre v. Comm'r of Social Sec. Admin.*, 439 F.3d 1001, 1005 (9th Cir. 2006) ("The POMS does not have the force of law, but it is persuasive authority."); *Chavez v. Dep't of Health and Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996) (holding that social security rulings "are interpretive rulings and do not have the force of law"). For this reason, they are not entitled to deference under *Chevron*.

---

[5] The SSA's interpretation also appears "loosely [ ] within the SSA's discussion of its implementing regulation for the uniformed services exception." *Martin*, 903 F.3d at 1160 & n.43 (citing 60 Fed. Reg. 56,511, 56,512 (Nov. 9, 1995)). The uniformed-services exception is addressed in a single, brief sentence.

An interpretation that does not carry the force of law, however, may still be entitled to *Skidmore* deference as long as it is not plainly erroneous or inconsistent with the governing statute. *See Chavez*, 103 F.3d at 851. Here, the acquiescence ruling states that the SSA

> interpret[s] the uniformed-services exception to the WEP to mean that only monthly payments based on military service are exempt from the WEP . . . . The legislative history of the [exception] explains that the purpose of the exception was to exempt military retired pay, based on noncovered [inactive duty training] military duty, from application of the WEP. The exception was not intended to exempt any pension based on civilian work from application of the WEP.

77 Fed. Reg. at 51,843. The acquiescence ruling is not sufficiently detailed, careful, or imbued with the "power to persuade," such that it merits strong judicial deference. *See Skidmore*, 323 U.S. at 140. SSA's explanation for the ruling is not particularly thorough, either: its explanation is limited to a few sentences, *see, e.g.*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976), and the rationale for not exempting dual-status technicians' CSRS pensions is based entirely on a discussion of the legislative history, which—as discussed—is itself unclear. *See* 77 Fed. Reg. at 51,843. Nor are we convinced that the exception "was not intended to exempt any pension based on civilian work from application of the WEP," *id.*, simply because the history is silent on this issue. The POMS is not much more helpful. It limits the application of *Petersen* to the Eighth Circuit, but does not contain any further justification for the SSA's decision to do so.

Nonetheless, the Commissioner's preferred interpretation of the uniformed-services provision is at least a "permissible construction of the statute," *see United States v. Home Concrete & Supply, LLC*, 556 U.S. 478, 486–87 (2012), and the SSA's longstanding, technical expertise in administering the Social Security Act is owed deference. As discussed, the provision can reasonably be interpreted in two different ways: it can be understood as exempting from WEP reduction all pension payments based on *membership* in the armed forces, or as exempting such payments based on *service* conducted as a member of the armed forces. The SSA urges us to adopt the latter interpretation, and its position is an acceptable reading of the text of the uniformed-services provision.

The provision concerns an "interstitial administrative matter," one in "which the agency's expertise could have an important role to play." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 311 (2013) (Breyer, J., concurring in part and in the judgment). Recognizing the Byzantine framework of the Social Security Act and the intricacy involved in the administration of social-security retirement benefits, Congress chose to delegate broad authority to the SSA to interpret its own statute and issue rules and regulations in accordance with that statute. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981). The complexity of the Act and the need for agency expertise and guidance in its interpretation warrant deference to the SSA in its reasonable interpretive choices. *See Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 390 (1984).

Although the uniformed-services exemption can be read differently, the SSA's construction "can be reasonable even if another, equally permissible construction of the statute could also be upheld." *Baldwin v. United States*, 921 F.3d

836, 843 (9th Cir. 2019). For these reasons, we extend deference to the SSA's reading under *Skidmore* and hold that the uniformed-services exemption does not apply to CSRS payments received by dual-status technician retirees, such as Larson.

**AFFIRMED.**